IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| TOISA LIMITED, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-10-4177 |
| | § | |
| CAMAC INTERNATIONAL CORP., | § | |
| | § | |
| Defendant. | § | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This case came on for a three day trial on April 3, 2012, and
after all parties rested and closed the evidence, the Court heard
and considered the arguments and authorities of counsel, and
following trial read and considered the parties' post-trial
submissions, and now makes the following findings of fact and
conclusions of law pursuant to Fed. R. Civ. P. 52.

**Findings of Fact**

**From a preponderance of the evidence, the Court finds:**

1.   Toisa, Limited ("Toisa") is a Bermuda limited liability
     company with its place of business in Greece.   It owns
     approximately 24 vessels, including the offshore construction
     vessel TOISA PROTEUS.   Gregory Callimanopulos was at all
     material times the Chairman of Toisa and its sole owner, and
     at all times it was he who had the "final word" on whether and
     on what terms Toisa would charter the Toisa Proteus to another

party.   Richard W. Baldwin was at all material times Toisa's Deputy Chairman.

2.   Brokerage and Management Corp. ("B&M") acts as Toisa's agents in New York pursuant to the terms of an agency agreement. Baldwin was at all relevant times B&M's president and general counsel.  Peri Callimanopulos, the son of Gregory Callimano-pulos, was at all relevant times B&M's Vice President.

3.   Sealion Shipping Ltd., based in the United Kingdom, is Toisa's vessel manager pursuant to the terms of an agreement. Johnathan Golding was at all relevant times the commercial director of Sealion, and reported to Gregory Callimanopulos on a daily basis.

4.   CAMAC is a Texas corporation with its principal place of business in Houston, Texas.   It is in the business, *inter alia*, of oil exploration and construction, particularly in and offshore Nigeria.   Komoru Lawal was at all relevant times President and a director of CAMAC.   Steven Hill was at all relevant times CAMAC's Senior Vice President, New Ventures. Jean-Michel Malek was at all relevant times General Counsel for CAMAC.

5.   Oceanic Consultants USA ("Oceanic USA") is a subsidiary of CAMAC and is also based in Houston.   Steven Hill at all relevant times was Oceanic USA's Chief Operating Officer. Natalia Milovankina was at all material times a project

2

control specialist for Oceanic USA and, at least as to the subject matter of this suit, took directions from and reported to Hill.

6.  Oceanic Consultants Nigeria ("Oceanic Nigeria"), based in Lagos, Nigeria, is a Nigerian company.  Although Oceanic Nigeria and CAMAC have some common shareholders, Oceanic Nigeria is not a subsidiary or parent of CAMAC.

7.  Upon learning that CAMAC may need a vessel for offshore field support off Nigeria, on September 15, 2010, Sealion's Golding sent an email through a London broker to convey to CAMAC an offer of the Toisa Proteus for CAMAC.  Golding attached to the email a "commercial summary" of the offer.

8.  The Toisa Proteus is a very large and new (built in 2002) state-of-the-art, multi-purpose offshore construction vessel, valued at about $100 million.  It has a length of about 440 feet, a width of 70 feet, and its deck machinery includes a 400-ton offshore crane, suitable for operating to a depth of more than 2,200 meters.  The vessel accommodates 200 passengers, and includes a helideck, hospital, gymnasium, and other amenities.

9.  On September 16, Eduardo Arana, who did not act as a broker for CAMAC in this matter, conveyed Golding's email offer to Hill at CAMAC.

3

10. Upon receiving Toisa's commercial summary offer, Hill directed his assistant, Milovankina, to prepare a draft charter party.

11. The first line of the "Charter Contract" drafted by Milovankina read: "This Contract is made on the date signed by and between the following parties:" with the named parties being Toisa Limited, as "Contractor," and CAMAC, as "Company."

12. Milovankina's draft Charter Contract was the first of several versions of this comprehensive document that were extensively revised in exchanges between the parties during the ensuing several weeks. Each of the drafts, however, always carried forward the opening proviso: "This Contract is made on the date signed by and between the following parties:" with the names of Toisa Limited and CAMAC then following.

13. CAMAC sent its first draft of the Charter Contract to Sealion on September 16, 2010, captioned "Rev. A of CHARTER CONTRACT DRAFT."

14. On September 18, 2010, Golding by email sent a redraft of the document, also entitled "Rev. A of CHARTER CONTRACT DRAFT," which included numerous changes throughout the document, both on major items (e.g., day rates for vessel) and on minor items, including even mere edits (e.g. striking through two duplicated words that were obviously a redundant typo).

15. Toisa's proposed revisions were made by using the "track changes" feature of Microsoft Word. This method of editing

4

was, with a couple of exceptions, used by both parties with each subsequent exchanged draft. Thus, with the exception of a couple of deletions, the revisions in the later drafts were "cumulative" of the revisions that had therefore been made during the negotiations.

16. After several email exchanges between the parties in which various points were negotiated and differences were stated, Milovankina sent by email to Golding and Peri Callimanopulos a revised draft of the contract, identified as "Rev. B," which contained numerous further changes and comments.

17. Rev. B was not acceptable to Toisa and, the next day, on September 30, 2010, Golding emailed to Milovankina and Peri Callimanopulos a further revision, captioned "Rev. C," which was not acceptable to CAMAC.

18. The parties agreed to meet in CAMAC's Houston office on October 6, 2010, to attempt to finalize a contract.

19. Gregory Callimanopulos directed Peri Callimanopulos and Dean Steele to attend the Houston meeting for Toisa, and Hill and Milovankina represented CAMAC. Eduardo Armana also attended part of the meeting.

20. Dean Steele is employed as Assistant General Counsel by Toisa's New York Agent, B&M, and reports to Richard Baldwin, B&M's President and General Counsel and, as found above, Deputy Chairman of Toisa. (*See* Finding of Fact No. 2, above.)

21. At the Houston meeting, the parties went page for page through
    the most recent draft of a contract and discussed a wide range
    of issues.     Toisa's representatives fully understood that
    CAMAC needed simultaneously to consider the requirements of
    Nigerian AGIP Exploration Ltd. ("NAE"), the entity with which
    CAMAC was seeking to forge a back-to-back charter transaction,
    and hence, what rates NAE would accept, how NAE would provide
    security to the vessel and its crew, and the like, were
    important to CAMAC during its negotiations with Toisa.
    Toisa's representatives also understood that a key to the
    transaction was the vessel's ability to accommodate remote-
    operating vehicles ("ROV"), without which capability CAMAC
    would have had no interest in the Toisa Proteus. One of the
    matters discussed during the October 6th Houston meeting was
    the need to install two ROVs on the vessel, which would take
    about two weeks' time to achieve. CAMAC believed at that time
    that CAMAC would have ROVs available.

22. During the Houston meeting the parties reached agreement on
    certain issues, but other issues important to one or both
    parties were left unresolved.

23. When the meeting ended, it was agreed that Steele would edit
    and revise "Rev. C" of the draft document to incorporate the
    changes upon which agreement had been reached.

24. The parties also agreed that Milovankina would write new language for Appendices B and D to the contract, which included security provisions for the vessel and crew.

25. Hill agreed to meet Peri Callimanopulos and Steele that evening for drinks in the bar at the St. Regis Hotel, where the visitors were staying. Arana also joined Hill and Peri Callimanopulos at the hotel bar, and Steele arrived a half hour or so later. Peri Callimanopulos stated that he had called his father, Gregory Callimanopulos, to report the results of the day's meeting and to hear his father's reactions to CAMAC's proposals on security issues, the number of crane operators to be provided, and who would pay for them, and other items. Milovankina was not invited to the gathering at the hotel bar. After about an hour, the participants parted to fulfill separate dinner engagements.

26. Late that same night Steele sent to Milovankina an email, which he regarded as personal and therefore did not produce with Toisa's required pretrial discovery production, in which--apart from his personal remarks to Milovankina--he stated, "Hopefully, we can work out a contract."

27. The parties did not reach agreement for a charter party on October 6th, a fact that Toisa's witnesses admitted at trial.

28. The next day, on October 7, 2010, Sealion's Golding offered the Toisa Proteus to an unrelated third party, Acergy Paris,

for a charter to commence on November 15, 2010, with a duration of 172 days, which would directly conflict with the proposed charter then still being negotiated with CAMAC. Golding's offer to Acergy Paris was subject to vessel availability, which he routinely states in offers, and was to remain open through October 21, 2010.

29. Also on October 7, Milovankina sent by email to Peri Calli-manopulos and Steele her proposed changes in Appendix B and Appendix D to Rev. C, and later that evening, Steele forwarded to Hill and Milovankina a new version of the draft, captioned "Rev. D," which did not incorporate Milovankina's new appendices. Steele cautioned CAMAC's representatives that Sealion had not yet reviewed "Rev. D" and further comments may be forthcoming.

30. Late on Friday afternoon, October 8, Peri Callimanopulos sent an equivocal email to Hill: "I think we are ok on the revised security language," adding that Toisa may want to accept Hill's offer "to visit and experience the security measures first-hand."

31. Security was a major consideration for Toisa. In its initial commercial summary on September 15, 2010, Golding had stated that the offer was subject to "Owner's approval of Charterer's Security Plan," and Toisa never altered that requirement.

8

32. Toisa's concerns about security were elevated because of the vessel's intended use offshore Nigeria.   Toisa's owner, Gregory Callimanopulos, testified that previously he had had ships in the area and that such was "problematical."   He explained:

> It is a lawless area, and the crew is subject--if not done correctly, the crew is subject to certain dangers in transferring from airports or to the airports or going then to the ship by way of flying, if you do it by launches instead of helicopters. I mean, it is a tricky situation.

33. Gregory Callimanopulos was also privy to the problems other shipowners had encountered in the area, including hijacking, although none of his own vessels had been hijacked.

34. A further reason for Toisa's elevated concern about security was because the Toisa Proteus is a major asset of Toisa's. Gregory Callimanopulos called it a "major unit" in the offshore vessel industry.  He explained:

> It is a big ship, big crane, large accommodation, et cetera. Secondly, it is a highly expensive ship . . . worth close to $100 million.

35. Thus, from the beginning of negotiations, Toisa in its initial edits to Rev. A required CAMAC always to maintain a minimum of two security vessels on standby near the Toisa Proteus with suitably trained security personnel on a 24/7 basis, both to protect and provide escort duties for the vessel during the

charter period in Nigerian territorial waters. Toisa also specified numerous other security requirements.

36. On this critical issue, CAMAC advised Toisa that security must be coordinated with NAE's security procedures, which caused Toisa to request "precise procedures that will be provided by [CAMAC] and/or NAE."

37. Toisa never viewed first hand the security measures to be provided by NAE and/or CAMAC, which it had said it might want to do, and Toisa never gave unequivocal approval to CAMAC's most recent counter-proposal on security specifications, which Milovankina drafted on October 7th.

38. Another main term that emerged during the negotiations was the wording to be included in the "Knock for Knock" clause. Although Milovankina earlier in the negotiations had stated to Golding that she would have "our legal department to review [the draft] in parallel," this did not happen. After the Houston meeting, Hill asked CAMAC's general counsel, Jean-Michel Malek, specifically to review the Knock for Knock clause. He then reported to Peri Callimanopulos CAMAC's objections to the carve outs and exceptions in the clause.

39. This led to a telephone conference on the afternoon of October 12, 2010, in which Hill and Malek participated for CAMAC, and Peri Callimanopulos, Steele, and Golding spoke for Toisa.

40. In the October 12th telephone conference Malek emphatically stated that the present "Knock for Knock" liability provision was unacceptable to CAMAC because it contained numerous carve outs. To emphasize the critical importance of this clause to CAMAC, Malek stated that without resolution of the Knock for Knock clause there was no need to discuss the rest of the draft contract.

41. Toisa maintained a contrary position. Peri Callimanopulos liked the wording in a BIMCO Supply Time 2005 Form Charter Party and said he would email that form to Hill in an attempt to persuade CAMAC to change its position.

42. On October 13, Hill emailed Peri Callimanopulos that he was waiting for Toisa's new Knock for Knock liabilities paragraph, and Peri Callimanopulos replied that Toisa was waiting for CAMAC to come back with new language. In another exchange later that afternoon, Hill told Peri Callimanopulos that he had not received the BIMCO wording, and added: "But if it is exactly the same all we are going to do is take the exceptions out and resend it back."

43. Peri Callimanopulos emailed a set of carve outs and exceptions lifted from the BIMCO contract, and asked Hill to have his general counsel review them. Hill replied the next day that CAMAC was working on revisions, that Peri Callimanopulos should cancel plans for Hill to come to New York for the

11

signing of a contract on Friday, and that the target for reaching an agreement should be put off to the following week.

44. On Friday, October 15, Peri Callimanopulos emailed an inquiry to Hill asking how CAMAC's comments are progressing and stated, "We have everyone teed up to review same once received." Hill replied that he should have the "final to you by Monday NLT 11:00 a.m. This will include our internal legal review, external legal review, and approval by the Board after you accept the final."

45. Hill missed his Monday morning goal. Late on Monday, October 18, Hill told Peri Callimanopulos by email that "Liability language will come to you by end of today from [CAMAC's outside counsel] Kerry Williams and will be a rewrite of Knock for Knock equal to both sides with no carve outs."

46. Peri Callimanopulos thereupon forwarded Hill's message to Golding, Baldwin, and Steele.

47. The Knock for Knock clause was a major issue for CAMAC because of the proposed three-year term of the charter party, the high risks associated with offshore operations under the best of circumstances and, here especially, in dangerous waters offshore Nigeria.

48. CAMAC'S proposed Knock for Knock clause was also of great concern to Toisa. When a standard clause with customary carve outs is used in charter parties, the cost of Toisa's

12

protection and indemnity insurance coverage is a known or readily determinable amount. Toisa recognized that a Knock for Knock clause with no exceptions on a long-term charter party for a major unit may put at risk Toisa's insurance coverage. Gregory Callimanopulos explained that he sometimes has requested the P&I Club to review a non-standard provision in a charter party and, depending upon the clause, the P&I Club may decline to provide insurance coverage or may underwrite the risk at a higher premium.

49. For CAMAC the Knock for Knock clause was not only a "main" term but, as suggested by its general counsel, was a deal breaker if the clause contained standard carve outs and exceptions. This required Toisa also to recognize Knock for Knock as an issue of very high importance, perhaps requiring review by its P&I Club to determine if insurance coverage would be underwritten and, if so, at what cost.

50. At the close of business on October 18, when he forwarded to his superiors Hill's email that CAMAC's outside counsel was rewriting the Knock for Knock clause "with no carve outs," Peri Callimanopulos confided to Golding, Baldwin, and Steele, "I am worried about . . . 'no carve outs' as regards the Knock for Knock."

51. The parties never reached agreement on a Knock for Knock clause.

13

52. As of October 19, 2010, therefore, after approximately four
    weeks of negotiations in an effort to reach an agreement and
    come to a meeting of the minds on a comprehensive charter
    contract, the parties still were unsuccessful. Not only were
    they apart on the Knock for Knock clause, but clear agreement
    had not been reached on other essential terms, including the
    vessel's security and the vessel's transit rate.

53. In the early evening of October 19, 2010, Hill wrote to Peri
    Callimanopulos an email entitled "Major Setback Today,"
    stating the following:

> Oceaneering just informed me that their ROV in
> Nigeria is not really available and never was as it
> was on contract and the operator has extend [sic]
> their option to extend the contract. Shipping one
> from US is not an option costwise at this time. ...
> I am forced to inform NAE in the am of this
> situation. I don't expect any relief nor
> understanding on their part. ... as we have changed
> vessels and ROVs with them on four previous
> occasions.
>
> We have no working class 225hp ROV nor access to
> any the [sic] we can ship to Nigeria. We are
> checking UK now.
>
> Until we solve the ROV issue we cannot in good
> faith discuss a 1 Nov 2010 start or mob date.
>
> NAE will not accept vessel without an ROV.
>
> I appreciate your company's efforts to work with us
> but must say that we are not hopeful to solve this
> in the next few days.
>
> We are truly sorry to inform you of this decision.
> Also thank you for providing the drawings to
> Oceaneering and I will ask for their return. Until

14

> further notice Camac/Oceanic must withdraw from
> this contracting process with Toisa.

54. The next day, Golding responded to Hill on behalf of Toisa,
    alleging for the first time that "an agreement was reached
    between Toisa Ltd. and CAMAC for chartering the Toisa Proteus"
    and threatening to sue if CAMAC did not "perform the charter."

55. The following week--on October 28th--Toisa filed the instant
    lawsuit to compel CAMAC to arbitration, alleging:

> At a meeting [in Houston] on October 6, 2010, all
> of the main terms of the charter party were finally
> agreed, including Toisa's acceptance of CAMAC's
> 'knock for knock' clause (Clause 13b). Therefore,
> a binding charter party existed at that time.

Toisa repeated this same allegation both in its First Amended
Complaint and again in its Second Amended Complaint, which was
its live pleading at trial. By the time of trial, however,
Toisa abandoned the October 6th date and claimed that it was
"on or before October 12, 2010," that CAMAC entered a "binding
fixture for the charter" of the Toisa Proteus.

56. The terms "fixture," "fix," "fixed," and the like were never
    written, spoken, or used by any of the parties at any time
    during their negotiations that terminated on October 19.

57. When parties negotiate a charter party by agreeing to a
    fixture, it is customary industry practice contemporaneously
    to state that agreement by exchanging a "fixture recap" or

other equivalent writing to confirm that the charter has been fixed and recapping its main terms.  It is also typical to incorporate an industry-standard pro forma charter form, which becomes the default agreement for all "details" that are not otherwise agreed in the drafting of a final charter party agreement.

58.  Neither Toisa nor CAMAC ever sent to the other a fixture recap, nor did they ever agree on an industry-standard pro forma charter form for "details."

59.  As Toisa's witnesses conceded at trial, they never--even internally--wrote an email, issued a memo, or made any record whatever that Toisa was bound to a fixture for the engagement of its major unit, the Toisa Proteus, or thought they were so bound, before negotiations ended on October 19.  There is nothing that can be read as a "fixture recap," nor is there objective evidence that either party intended to use the fixture method of forming a charter party.

60.  Both parties were agreed that neither party would be bound to a charter party until the date a complete contract was finalized, agreed, and signed by both.

61.  Toisa had good reasons to require a complete written contract, inclusive of all the details, given the unusually long term of the charter--three years, the complex nature of the transaction, the vessel's contemplated use offshore Nigeria,

16

and the extremely high value of this "major unit." Toisa's sole owner, Gregory Callimanopulos, explained that shorter term charters--for a matter of days or weeks, may be on

> short term fixtures, . . . just an electronic confirmation on the basic--on the basic terms, and refer to, let's say, otherwise as per terms of BIMCO. But on more lengthy contractual periods, people then on the whole will resort to having a signed document such as this one with or without initials.

62. Gregory Callimanopulos agreed that CAMAC's negotiations for the Toisa Proteus fell into that latter category, where a complete charter party would be agreed and signed. The typical length of a charter, unlike ten years ago, he said, is now only for a "few months, a year," and that "[t]hree years is a substantial period within the configuration of periods of a charter." Even when the two-step fixture method is employed, according to Gregory Callimanopulos, Toisa follows up with written signed contracts on longer term charters because

> it is a manageable document for the ongoing transaction. If something occurs, both parties have ready reference to what they had agreed and how it applies to the given circumstances.

63. Far from contemplating a fixture in this highly complex negotiation, however, Toisa manifested even in its internal communications its expectation that neither party would be

17

bound until there was a complete signed charter party
contract. Thus, fairly early in the negotiations, when
Golding had determined that an additional premium of as much
as $130,000 may be charged by its P&I Club due to the vessel
being in Nigerian waters, Peri Callimanopulos directed Golding
not to mention to CAMAC the additional premium "until after
contract signed," as Golding recorded on his daybook. Toisa
believed that under the War Risks Clause of the comprehensive
document being negotiated, once the contract was agreed and
signed, the premium then could be passed on to CAMAC.

64. CAMAC also had good reasons to require a complete written
contract, not only because of the unusually long term of the
charter party, but also because of the corresponding
arrangement it was negotiating with NAE and the need to make
sure that both contracts worked together. For example, CAMAC
contemplated a "bridging agreement" with NAE to interface
NAE's agreement with the vessel security arrangements that
CAMAC was negotiating with Toisa, and which were of major
importance to Toisa. Further, in chartering a major vessel
for long term use in high risk operations offshore Nigeria,
CAMAC wanted to limit its liabilities with a Knock for Knock
clause tailored to cover the risks that CAMAC perceived.

65. During the multiple edits, additions, deletions, and entries
of numerous comments made by the parties during their back-

and-forth exchanges of the detailed Charter Contract draft over a period of about four weeks, the first sentence in the document was never changed or "tweaked" by either party: "This Contract is made on the date signed by the following parties:."

66. After the initial exchanges of "Rev. A" between Milovankina and Golding, neither Toisa nor CAMAC ever acted in any way from which it could objectively be inferred that either party expected or thought they were engaged in negotiations for a fixture, with details to follow.

67. From a preponderance of the evidence, both Toisa and CAMAC, when their conduct throughout the negotiations is objectively examined, at all times were of one mind that there would be no charter party until a comprehensive charter party agreement, as to which they were negotiating every detail, was signed by both parties.

68. There was never a meeting of the minds or mutual agreement by and between Toisa and CAMAC on all main terms that arose and were at issue in these negotiations and that were therefore essential to the formation of a charter party, and hence, even if they had desired a fixture, they never achieved one.

69. There are no facts from which it can be objectively found that Toisa and CAMAC mutually agreed to a fixture for the Toisa

19

Proteus, with the details of the charter party later to be
agreed.

70. At no time did Defendant CAMAC enter into a binding fixture
for the charter of the Toisa Proteus that includes any
requirement for the parties to arbitrate all disputes in
London.

## Conclusions of Law

**The Court makes the following conclusions of law:**

1. The Court has jurisdiction of the parties and of the subject
matter of this case.

2. A charter party for the charter of an ocean going offshore
construction vessel is a maritime contract that is governed by
U.S. Federal maritime law.

3. Charter party formation is governed by general principles of
contract law. Marine Overseas Servs., Inc. v. Crossocean
Shipping Co., Inc., 791 F.2d 1227, 1234 (5th Cir. 1986).

4. "[A] charter is formed as soon as the traditional elements
of a contract are present, such as consideration, offer
and acceptance, mutuality of [assent] . . . ." Id. (quoting
10 WILLISTON ON CONTRACTS § 1072 (3d ed. 1967)).

5. Customs of the shipping industry are instructive in analyzing
whether a contract has been formed. See, e.g., Great Circle
Lines v. Matheson & Co., Ltd., 681 F.2d 121, 125 (C.A.N.Y.

1982) ("Certain long-standing customs of the shipping industry are crucial factors to be considered when deciding whether there has been a meeting of the minds on a maritime contract.").

6.   Charter party practice typically involves two stages: the fixture stage and the details stage. *See* <u>Cross Chartering N.V. v. R.I.P.C. (Trinidad), Ltd.</u>, No. Civ. A. H-04-2264, 2005 WL 2921645, at *7 (S.D. Tex. Nov. 2, 2005) (Rosenthal, J.); <u>Great Circle Lines</u>, 681 F.2d at 125. The process is described in a leading treatise on the subject:

> The market for ships is international, and charterers and shipowners customarily deal through professional ship and charter brokers who send and receive telex and other communications all over the world. Most charter parties are ultimately reduced to writing, usually on a standard printed form, but, before the final written agreement, the 'bare bones' of a charter may be 'fixed' by an exchange of telexes. Such a charter party 'fixture' is a meeting of the minds, evidenced by the parties' communications, on the significant 'main terms' of a charter. . . . After a fixture has been reached, the parties may continue to negotiate 'details,' which are minor or side-issues 'fleshing out' the main terms.

2 THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 11-2 (4th ed. 2004).

7.   Once a fixture is reached, a binding charter party has been formed. *See* <u>Cross Chartering</u>, 2005 WL 2921645, at *7; <u>Hornbeck Offshore Servs., LLC v. Fairfield Indus., Inc.</u>, Civ.

21

Case 4:10-cv-04177   Document 107   Filed in TXSD on 05/30/12   Page 22 of 26

A. No. 09-2905, 2010 WL 2008971, at *2 (E.D. La. May 17, 2010).

8.     On the other hand, the parties may manifest an intent to negotiate a charter party that will become binding only upon signature of the final, written charter party. *See, e.g.,* Orient Mid-East Great Lakes Serv. v. Int'l Export Lines, Ltd., 315 F.2d 519, 523 (4th Cir. 1963) ("the words and acts of the parties quite plainly also manifest their intent, from the very beginning, that the ship's engagement would await execution of a written memorial of its terms"); Gardner v. The Calvert, 253 F.2d 395, 399 (3d Cir. 1958), *cert. denied*, 78 S. Ct. 997 (May 19, 1958) ("If the parties intend not to be bound until a written memorial is executed by each, then they are not bound until that event takes place.  On the other hand, although parties may intend to put their agreement in writing, it does not follow that they have not made a contract until the writing is completed and signed.").

9.     In order to have a meeting of the minds on the main terms to fix a charter party, it is necessary that "the essential terms of the agreement are sufficiently definite to be enforced" and that the parties "manifest objectively an intent to be bound by the agreement."  1 RICHARD A. LORD, WILLISTON ON CONTRACTS § 3.2 (4th ed. 2010); *see also* Great Circle Lines, 681 F.2d at 124 ("Under general contract law principles no contract exists

where the parties fail to agree on all the essential terms or where some are too indefinite to be enforceable."); Hornbeck Offshore Servs., 2010 WL 2008971, at *5 (finding that while evidence supports the conclusion that one party may have had a subjective intent not to be bound by the contract, it is the objective intent that controls, citing 1 LORD, WILLISTON ON CONTRACTS § 3.5 (4th ed. 2010)); Cross Chartering, 2005 WL 2921645, at *7 ("A charter comes into existence when the parties have a meeting of the minds on the essential terms"); Interocean Shipping Co. v. Nat'l Shipping & Trading Corp., 523 F.2d 527, 534 (2d Cir. 1975) (same).

10. It is industry practice to memorialize in writing or otherwise to confirm that a fixture has been reached. Hornbeck Offshore Servs., LLC, 2010 WL 2008971, at *2 (email stating party was "pleased to accept your commercial terms and conditions"); M P Zarat Ltd. v. Jumbo Nav. NV, No. Civ. A. H-05-4102, 2007 WL 7210408, at *2 (S.D. Tex. June 6, 2007) (Ellison, J.) (one party sends email stating that it accepts the other party's offer, the parties meet in person and orally agree to same and shake hands on agreement, and the first party sent a confirmation email noting same); Sunskar Ltd. v. CDII Trading, Inc., No. 11 Civ. 2499 (DLC), 2011 WL 5243165, at *2-3 (S.D.N.Y. Nov. 3, 2011) (parties orally agree on main terms with experienced party explaining repeatedly to inexperienced

party the process of fixing main terms and experienced party emails fixture recap after oral agreement); <u>Great Circle Lines, Ltd.</u>, 681 F.2d at 123-24 (brokers for both parties noted that they were "fixed" or "agreed" subject to details and fixture recap was requested by one party); <u>U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., Ltd.</u>, 241 F.3d 135, 139 (2d Cir. 2001) (fixture recap); <u>In re Arbitration Between Andolina Shipping, Ltd. v. TBS Eurolines Ltd.</u>, 84 F. Supp. 2d 527 (S.D.N.Y. 2000) (fixture confirmed by telex); <u>E.A.S.T., Inc. of Stamford, Conn. v. M/V Alaia</u>, 673 F. Supp. 746, 798 (E.D. La. 1987) (fixture recap); <u>Samsun Corp. v. Khozestan Mashine Kar Co.</u>, 926 F. Supp. 436, 438 (S.D.N.Y. 1996) (fixture recap); <u>P.E.P. Shipping (Scandanavia) ApS. v. Normaco Shipping Corp.</u>, No. CIV. A. 96-3136, 1997 WL 358118, at *1-2 (E.D. La. June 24, 1997) (fixture recap); <u>Atlantic & Great Lakes S.S. Corp. v. Steelmet, Inc.</u>, 565 F.2d 848, 849 (2d Cir. 1977) (fixture recap); <u>Interocean Shipping Co.</u>, 462 F.2d at 676 (fixture note).

11. "Whether there was a meeting of the minds resulting in a charter party is a question of fact." <u>Great Circle Lines</u>, 681 F.2d at 125.

12. The United States has implemented the Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("the Convention") through the enactment of 9 U.S.C. §§ 201-208;

Francisco v. STOLT ACHIEVEMENT MT, 293 F.3d 270, 272 (5th Cir. 2002), *cert. denied*, 123 S. Ct. 561 (2002).

13. A court should compel arbitration under the Convention "if (1) there is an agreement in writing to arbitrate the dispute, (2) the agreement provides for arbitration in the territory of a Convention signatory, (3) the agreement arises out of a commercial legal relationship, and (4) a party to the agreement is not an American citizen." Francisco, 293 F.3d at 273 (citing Sedco, Inc. v. Petroleos Mexicanos Mexican Nat'l Oil Co., 767 F.2d 1140, 1144-45 (5th Cir. 1985)).

14. "[T]he phrase 'agreement in writing' shall include an arbitral clause in a contract or an arbitration agreement, signed by the parties or contained in an exchange of letters or telegrams." Sphere Drake Ins. PLC v. Marine Towing, Inc., 16 F.3d 666, 669 (5th Cir. 1994) (citing Art. II § 2 of the Convention).

15. "Although there is a strong federal policy favoring arbitration, 'this federal policy favoring arbitration does not apply to the determination of whether there is a valid agreement to arbitrate between the parties." Will-Drill Resources, Inc. v. Samson Resources Co., 352 F.3d 211, 214 (5th Cir. 2003) (quoting Fleetwood Enters. Inc. v. Gaskamp, 280 F.3d 1069, 1073 (5th Cir. 2002)).

16.  "Where no contract exists, there is no agreement on anything, including an agreement to arbitrate."  Id. at 215.

17.  At all times before negotiations ended on October 19, 2010, the actions of both parties objectively manifested a mutual intent to negotiate a comprehensive charter party and to be bound only when both parties had signed a final, fully agreed contract.

18.  Neither party ever objectively manifested an intent to agree to a fixture before negotiations ended on October 19, 2010.

19.  The parties never reached a meeting of the minds on all essential or main terms for a fixture to engage the ship.

20.  No binding charter party was agreed.

21.  Because no binding charter party was formed, no written agreement exists to bind the parties to arbitrate any dispute.

22.  If any of the foregoing Findings of Fact constitute Conclusions of Law, they are adopted as such; and if any of the foregoing Conclusions of Law constitute Findings of Fact, they are adopted as such.

The Clerk shall notify all parties and provide them with a true copy of these Findings of Fact and Conclusions of Law.

SIGNED at Houston, Texas, on this 30TH day of May, 2012.

EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE